Good morning, Your Honors. May it please the Court, my name is Doug Smith and I represent the appellant Gary Meeks. I'd like to reserve five minutes for rebuttal. Mr. Meeks challenges the District Court's order granting summary judgment on his Section 1983 claims for deliberate indifference to his serious medical needs, and he raises three primary grounds. First, Mr. Meeks, the District Court erred in concluding that there was no material issue of fact that warranted the case going to the jury. Second, the Court erred in imposing a requirement that Mr. Meeks supply expert medical testimony in order to support his Section 1983 claim, a requirement that no court in the Ninth Circuit has ever required. And finally, the District Court's request for the appointment of counsel, even though the District Court acknowledged that this was a complex case and defendants have acknowledged on appeal that this is a complex and technical case. With respect to the first issue, many of the record facts that are key here are actually undisputed. There's no dispute that Mr. Meeks suffered a broken jaw. He suffered fractures to his jaw and had loose teeth. There's no dispute that he required surgery to correct that problem. In the initial surgical report after the surgery was conducted, there's no dispute the surgeons indicated that Mr. Meeks may require follow-up surgery to further correct the problem and correct his dental problems. And there's no dispute that Mr. Meeks did not receive that follow-up surgery until over a year later. Here, the Court's decision in Hunt is dispositive. In Hunt, the Court held that summary judgment was inappropriate under very similar circumstances. In Hunt, you had a situation where there was a three-month delay in treatment, where an inmate had required some dentures for his dental problems, and prison officials had denied him treatment for three months. Here, the denial of treatment was much longer. It was over a year that Mr. Meeks had suffered with a broken jaw. And as a result, he suffered significant pain. He also had to live with a broken jaw for over a year. And he also suffered infection in his gums as a result of a lack of treatment. And many of those facts are simply undisputed. In fact, you have to – you have to tie this, I think, don't you, to an individual person, because you have to show deliberate indifference, right? You recognize that? Yes, Your Honor. And what is – what was the evidence on summary judgment that somebody who was named as a defendant was deliberately indifferent? Well, I'll go – Why don't you comment on that for a minute? Why don't I go defendant by defendant? For Defendant Parsons, if you just look at their statement of undisputed facts, it's on ER 149 to ER 150. Dr. Parsons had recognized repeatedly in the record here, and they did not dispute, that Mr. Meeks needed to be referred to the UCSD for follow-up. But didn't he do, you know, what he was supposed to do to the extent that things were under his control? Well, he never ensured – he was the chief medical officer, I believe, and he never ensured that there was any follow-up at UCSD. Certainly, he had an obligation to ensure that if Mr. Meeks needed treatment for his medical condition, which he recognized repeatedly during the time Mr. Meeks was at that facility, and he didn't get it, and that's documented in their undisputed statement of facts. So that's Dr. Parsons. With respect to Mr. Degoose – I'm probably butchering his name – but at any rate, he denied Mr. Meeks' request for treatment in an appeal that he had filed, and his basis for denial – Wait a minute. He denied a request for treatment? Well, there was a request for treatment, and Mr. Meeks said, I want to recover for, you know, monetary damages for the time that I haven't received treatment. But whatever his name is, he's not even, you know, connected with the healthcare department, is he? Well, he's in charge of hearing the appeals, and he had denied Mr. Meeks' appeal when he was complaining, I haven't received this follow-up care that I need from UCSD. And Mr. Degoose, if you take a look at ER 62, which is his declaration, indicates that he's the appeals coordinator. He's a screener, wasn't he? Excuse me? He was an ADA screener. He wasn't involved in healthcare. No, Your Honor, but he could have done something to remedy the problem when Mr. Meeks brought it to his attention. Well, didn't he say, though, in paragraph 5 that he had forwarded a copy of the form to the medical people so they would be alerted? So what else was he empowered to do since he was not a doctor or a representative? He could have followed up to ensure that Mr. Meeks ended up getting the care that he needed. The question is not whether he could have. The question is, you know, given what his duties were, was he deliberately indifferent to the prisoner's medical needs or dental needs? And he's not even associated with the healthcare department of the prison, right? Well, although he's – How could he be deliberately indifferent? Well, he's – You know, you tell a garbage collector, look, my teeth are – what is he supposed to do about it? Well, he is in charge of hearing the grievances that are filed by – I'm sorry. But as Judge Timlin says, grievances on what? Grievances on ADA, right? Not on medical treatment. Well, his basis for denying the appeal was that Mr. Meeks had included a request for money. So he's not saying – there's nothing in the record where he's saying, I didn't have authority to bring – in fact, Your Honor had noted that he did take some measures. We're just saying he could have taken additional measures. Well, because he did take an apparently quite reasonable measure, how could there be evidence that he is deliberately indifferent where he forwards the complaint to the medical folks who could actually deal with it? Isn't that as much as demonstrating that he doesn't? Well, he did deny – he denied the complaint even though he recognized that there was a problem here. He contacted the medical officials. But he did deny the complaint. Why shouldn't he have granted this complaint and then followed up? Because it asked for money. How was that going to give him medical care? Well, on the monetary relief, I'll cede you that he may not be authorized to give a monetary relief. But on the other claim for relief, to ensure that I get medical care, he could have granted that instead of denying it. Had he granted it, what would he have done other than forward it to the medical folks, which is what he already did? Well, again, all I can say is that he should have followed up on that. He recognized that there was a problem. All he did was refer it to the medical folks without ensuring that they actually took action. I mean, it's as if, you know, it's similar, Dr. Parsons simply said, oh, Mr. Meeks needs follow-up at UCSD, but he didn't do anything to ensure. Well, the difference is he's a doctor and he was supposed to be doing that as distinct from just looking at paperwork. Well, I guess our view of the function of Mr. Degoose, he's in charge of hearing grievances. My view of his job, and maybe it's not in the record and there's a disputed issue of fact that should go to the jury because you could argue it either way. No, it's not in the record. There's no disputed issue of fact. Well, I think that here's what's in the record. He's in charge of hearing grievances. He denied this grievance. He didn't ensure that he got medical help. So based on those facts in the record, I think that at least there's an issue of fact that the claims against Mr. Degoose should go to the jury, although I'll cede that the claims against Dr. Parsons are certainly stronger than those against Dr. Degoose, as Your Honor had noted. Just briefly, I'll finish addressing Your Honor's question about the other defendants. Then we have the transfer to the different facility, and that's where Ms. Allison and Dr. Klarich take over. They were health care managers or the chief medical officer of the second facility. And here we have Mr. Meeks transferred to the new facility. The record's silent as far as any treatment occurring until he sees a dentist on October 12th. By the way, speaking of the second facility, isn't one of the claims that's being pursued, is that, well, somebody at the first facility is liable because they refused to intercede to prevent his transfer? Yes. Now, who was that person? That was Dr. Parsons. Now, is there something in the record that shows that Parsons had the authority to stop an inter-prison transfer? Well, I don't think that the defendants dispute that. He was, I believe, the chief medical officer. We'll ask him. Well, you can ask him. All right. Ask them, but certainly he could have requested a stop transfer. He was in charge of Mr. Meeks's case, and so he certainly could have requested it, but there's no evidence in the record that he did that. And, in fact, the day before he was transferred, he noted, and it's in the Undisputed Facts on page 150, that there was still this problem with Mr. Meeks's teeth wiggling, and he still had the fracture, and he should be referred to UCSD. So the day before he was transferred, Dr. Parsons is indicating there's a problem, and yet he didn't do anything to prevent the transfer. All right. Now, what about the people at the second facility? At the second facility, we got the transfer on June 19th. Mr. Meeks did not get surgery until February of the next year, and there's a gap between June and October where Mr. Meeks apparently didn't see any kind of physician or dentist. Dr. Klarich is the chief medical officer and health care manager. Ms. Allison was a health care manager, and so they were responsible for not even seeing anybody about this problem that Mr. Meeks kept complaining about. Their only defense is, well, eventually, in January, we said, yes, you're right, Mr. Meeks, you should be seeing somebody to, you know, for this follow-up surgery, and so we'll approve your request. But that was many, many months later. It was far longer than the delay in Hunt, which this court held was sufficient to raise an issue for the jury there. And so those are the grounds, you know, this long, months-long delay that occurred with nothing being done at the second facility. I'll just touch briefly, since my time is running out, on the last two issues. The second one, this requirement that Mr. Meeks support his case with medical expert testimony. There was no justification for that in the district court's ruling, and, in fact, it's against Ninth Circuit precedent. In Hunt, for example, the court held summary judgment was unwarranted, and there was no expert testimony supporting the inmate's claim in that case. The defendants rely on the Boren case from the Third Circuit, but that's distinguishable. That was a case where an inmate was complaining about something that was an error in the record indicating you need this treatment. You needed to bring in an expert to say that somehow it was necessary. That's not the case here. Everybody recognized that Mr. Meeks' jaw was still broken and that, indeed, this follow-up surgery just simply didn't receive it. And defendants concede in their brief on page 35 that Boren, if at most, stands for the proposition that where there's something that's not apparent, in some condition that's not apparent, that's when you might need medical expert testimony. But here, he had a broken jaw and everybody knew about it. And then with respect to the last issue, I'd only say that on appeal, defendants don't even justify the court's denial of counsel on the merits. They concede that this was a complex and technical case. Their argument is solely that, well, that's not an appeal-at-bull issue. But that goes against every decision the Ninth Circuit has issued. I mean, it routinely ---- What's the remedy at this point? Let me just assume for the sake of this question that we were to ---- well, either way, either that we were to agree that there's an issue for trial or that there isn't. If there isn't, then presumably there would be no remedy available. But if there is, what's the remedy now that he could get for not having counsel? Well, Your Honor, I would say even if the court concludes on this record that there's no issue for trial, the case should be reversed because if he had appointed counsel, counsel could have submitted additional material in the record that would have raised a factual issue. And so the failure ---- How do we know that? Well, in any case, we're going to have unknowns. But, for example, appointed counsel certainly could have deposed the defendants and obtained additional admissions that would support ---- Isn't it just completely speculative that there would have been additional admissions that would be helpful? I don't think it's speculative. And if that were the view or reversal depended on that, then nobody would ever be able to obtain any relief for denial of appointment of counsel. If we are just to conclude that it involves speculation that it might make a difference, then why even have a right to counsel at all? I think what Judge Graper is getting at is in order to, you know, to be able to pursue that claim, I think you have to show that he was somehow prejudiced by the failure to appoint counsel. And you've made no showing of prejudice. Well, I think, Your Honor, I respectively is wrong. If he had appointed counsel, for one, appointed counsel could have perhaps anticipated this requirement of medical expert testimony and obtained an expert. So I think in that alone there was prejudice. You know, when the court is recognizing this is a complex case, allegedly it requires expert testimony, and yet I'm not going to appoint counsel for you to assist you to obtain expert testimony and to assist you in your case. Well, on the question of appointing counsel, technically under the law, isn't it true that the court does not appoint counsel but merely request counsel to accept representation? Well, that's true. But there are plenty of appointed lawyers. I may be one of them that are willing to accept appointments. It's sort of like you. You didn't have to take this case, right, if you didn't want to. That's true. But there's a long list of lawyers that are lining up out the door to take these cases and have a privilege of arguing before you. Well, I'll say this is a real problem. Suppose there are no lawyers that are willing to accept representation. Well, Your Honor, I'd say this. Number one, the court has made clear that appointment is only for the extraordinary case. And so it's a limited ‑‑ it's only in limited circumstances that you're going to have appointed counsel. This case, we maintain, is such a case because the district court is recognizing its complex and saying you need an expert to testify in this case. Defendants on appeal are conceding it's complex and technical. And yet there was no appointment of counsel to assist Mr. Meeks. So I would say this is the limited case where appointment of counsel is warranted. And if the court sticks with its past precedent, there shouldn't be a problem with exceeding, you know, we wouldn't have lawyers appointed in every case. Well, the appointment on the Pelham level is a little different than somebody accepting representation on a case such as this at the trial level. Well, I don't know. I've been appointed in the Northern District of Illinois to do trial-level work. And I don't think that they have a ‑‑ it may be different here, but I don't think they have a problem having lawyers lining up to get the trial experience to handle the cases. In civil rights cases? Yes, it was a Title VII case, Your Honor. Okay. Thank you, counsel. Thank you very much. May it please the Court, my name is John Fazer, appearing on behalf of the defendants appellees. First of all, to put the issue of the expert requirement in context, it's ‑‑ the requirement is not that somehow the summary judgment was reversed simply because there was no expert providing a declaration on the plaintiff's behalf. It's limited to ‑‑ it actually has nothing to do with whether or not there was a serious medical need. It's limited to the issue concerning whether Dr. Parsons should have put a medical hold on Mr. Meek's transfer to ‑‑ Well, by the way, you concede Dr. Parsons had that authority to put a hold on the transfer? I do not. I do not. The underlying facts of that particular claim aren't there. I want to talk about the facts of whether, you know, he should have done it or not. I mean, do you concede that he had the authority to do it? Well, I'll say this, Your Honor. There's no ‑‑ there's nothing in the record indicating that there was ever a request made to put a hold on him. That's not the question. I'm asking you, did he have the authority? No, he did not. There's certainly nothing in the record to indicate that he did. There's nothing in the record ‑‑ I'm not asking you that, either, is anything in the record. I'm asking you, did he have the authority? No, Your Honor. Your answer is no? So in other words, if we were to appoint a lawyer and go back, it would be futile to take discovery because it would lead into a blank wall, is that what you're telling us? Yes, Your Honor. As far as you know? Yes, Your Honor. I suppose he could have filed a 602. There must be somebody who has the authority to do it, right? There. I suppose, but there are no facts in the record. What do you suppose? Who is it? In this circumstance, this particular ‑‑ Mr. Meeks was being transferred to a substance abuse treatment facility. Right. So there are other circumstances here that are not in the record that suggests that there are other medical reasons related to this particular person that were causing him to be transferred. Now, whether or not Dr. Parsons had ‑‑ there was no request, there was no authority for him to put a hold on him, and there's nothing to indicate. Let me say there was no request. I mean, that's contradicted, isn't it, by the defendant's own verified complaint that he did request it? That's not my understanding of the fact in the record, Your Honor. But even if it was, I think the issue is did, in his declaration, Dr. Parsons establish it? You keep breezing out of the question. My question is, you know, not even if there was. The question is, isn't it a controverted issue of fact whether or not he requested it? In other words, am I misstating the facts? No. No. You said a while ago there was no request. That's correct. But doesn't he allege in his verified complaint that he did make a request?  My understanding is that ‑‑ He may? You should know what's in the request. My understanding, my recollection of the record is that is not, that was not the allegation. All right. In any event, the medical expert requirement is limited not to whether or not there's a serious medical need, but the degree of that need. Now, Dr. Parsons, in his declaration, based on his recipient witness information and his expert opinion, opined that there was no emergent need for any treatment for Mr. Meek's condition other than initially when the assault occurred in January. At the time of the ‑‑ This is here on summary judgment. So what Dr. Parsons said is interesting, but it's only half the picture, and it might be the less important half. The plaintiff alleges and swears to that he complained over and over and over again about pain so great that he couldn't eat, about loose teeth, about all kinds of very serious problems. As you say, it's obvious that there was a serious medical need, and that in spite of complaints over and over and over to Dr. Parsons week in and week out, nothing particular happened to help him. Now, we have to take those facts as true for purposes of summary judgment. Why isn't there a genuine issue of fact? Because certainly Dr. Parsons saw him over and over and over again during that period, but no treatment resulted. So why doesn't that create an issue of fact? Well, there were 23 visits from January to June by Dr. Parsons and the medical staff. Exactly. That's exactly the problem, and he didn't solve the problem. And he doesn't say I'm incapable of solving the problem. This is beyond my knowledge or ability to help this person or get him to a surgeon or an expert. He just doesn't do it. Well, based on Dr. Parsons' declaration, those facts that were established by the defendants ‑‑ They're not established. This is summary judgment. That's the problem. You seem to be relying on Dr. Parsons' declaration as if it's a factual finding or something, but ‑‑ I suppose I could characterize it as there was no dispute by the plaintiff as to the 23 visits and the medical records that support the declaration that Dr. Parsons submitted. Well, I guess I'm having difficulty with it because the way I look at it on summary judgment where we have to look at it in favor of the plaintiff, all of those visits actually helped the plaintiff's case because he kept coming in and saying please help me. I have these terrible problems, and yet he wasn't helped. So one way to look at that is they did their best and they just couldn't solve it, but another way to look at it is they didn't care. Well, I think we're running into the realm of a negligence claim, not deliberate indifference. We have a situation where there's 23 visits. There's continuing care and treatment of Mr. Meeks over a six‑month period. In Estelle v. Gamble, there were 17 visits in a three‑month period of time, and the court held that that was enough to ‑‑ So that's all we do is we count visits. So a doctor who doesn't really care if this patient lives or dies, you know, can just kind of make appointments weekly and then, hey, no problem. Well, the medical records in Dr. Parsons' declaration state not only the dates that were visits, the medical visits or the office visits, but what happened in each circumstance. He notes what the problems are, the severity of the problem, and what he's doing about it. And on every turn, Dr. Parsons is doing something on his behalf. Aren't these most meaningless reasons as far as the plaintiff is concerned? He's losing weight, suffering pain, isn't getting insured, which was described for him. Well, again, Your Honor ‑‑ Dr. Parsons and me would have no doubt about that. Well, once again, the standard here is deliberate indifference. Were they ignoring his problem? No, they were treating it. Now, whether or not there's a disagreement over the course of the treatment or whether or not the doctor should have done A, B, and C, you know, that's a whole different situation. That's a negligence claim medical malpractice. This is deliberate indifference. Mr. Meeks was going to see Dr. Parsons. Dr. Parsons was doing something on his behalf at every turn. Now, because Mr. Meeks doesn't ‑‑ isn't healed after six months, that doesn't show deliberate indifference. At the most, it shows negligence. Regarding the appointment of counsel ‑‑ What about the record at the, you know, at the second drug treatment facility? He was there, what, six, seven months without anything being done at all? Again, and I think it's really telling the appellant's reliance on particularly the Ramos and Dean cases. Those cases were declaratory relief and injunctive relief cases against the system, the prison system as a whole. And that's the problem with the appellant's case, is they're not tying it to any of the individual defendants in this case. There could have been a seven-month gap, but Ms. Allison granted the request for referral to an oral surgeon. Dr. Clarence granted the request that the appellant made. There was nothing else they could have done. There's a 602 appeal form that's made. The request was granted in full on each occasion. There was nothing else that anybody or those individuals at the second facility could have done. Now, there's nobody else named, no other defendant, that could be attributed to a seven-month delay at the second facility. Well, Ms. Allison recognized the need for an oral surgeon. That's correct. Ms. Allison did grant the request. Was the surgery ever done? Yes, it was. How soon after the request? I don't recall, Your Honor. Your Honor, it really isn't relevant. The fact is, is that there is a request in front of an administrator. The administrator granted the request, and it was requested at the second level as well. She moved it down the line. She did what she could. She also wasn't a medical doctor, and she never personally saw Mr. Meeks. So the notion that she could have the requisite knowledge that this person had serious medical need is just not there. The same with Dr. Klarich. Although he's a doctor, he never personally saw Mr. Meeks. And, again, they both granted the request. There's nothing else they could have done. Regarding ---- See, here's the problem in a case like this where the person in the prisoner's situation, when you say, you know, he hasn't identified the correct individual who could have done something, you know, I'm sure. See, he saw who he could see and probably was not allowed to see anybody else, right? What else was he supposed to do to, we'll say, you know, have his claim heard? There's nothing else he could have done, right? So you're saying in the face of that, we know he didn't get the treatment he was supposed to get. I mean, this guy was what? He went months and months without, you know, with a broken jaw. He couldn't eat. He lost, what, 20, 30, 40 pounds? And you're saying it's nobody's fault because he hasn't identified the right person. What else is he supposed to do? Well, Your Honor, I'm here on behalf of the four individuals that are named in this case. Well, you're also a Deputy Attorney General of the State of California. What else was he supposed to do? Your Honor, I'm not here on behalf of the State of California or the Department of Corrections. I'm here for these individuals. They're sued in their individual capacities. I understand, and if this was an injunctive relief claim, declaratory relief claim, as the Ramos-Lamb cases, it would be an entirely different issue. That's not the case in this situation. It's a 1983 cause of action, individual capacity. The question is whether these individuals were deliberately indifferent to a serious medical need. There's simply no evidence to support that claim. Against these individuals? Against these individuals. And these individuals can't speak for other individuals. There is no respondent superior. And there is no claim against the State of California. Would a Menil claim have laid against the State of California if the State was named as independent? You don't want to speculate. I'd be speculating, Your Honor. I'm sorry. I don't. You know, we all know the correctional medical system is broken down, don't we? You know, I mean, it's like billions of dollars short of money, you know, to fund an adequate system. People are dying every day in prison, right, because of lack of treatment. I mean, that's almost a common fact, right? We've got a three-judge court now sitting in Sacramento trying to correct that. You know, the legislature and the governor are fighting over funding, right? And there's not enough money to treat these prisoners. We've got too many prisoners and not enough doctors. That's not the way it amounts to. That could be the case, Your Honor, but I'm standing here on behalf of four people, none of which had anything to do with this particular case as far as the delay. They did everything that they could, in fact, more. Well, Parsons never had anything to do with the delay? I mean, Your Honor, it's well documented in the record that he's seen it multiple times. In fact, even when Dr. Parsons learned that there was going to be a transfer to SATF, he puts in Mr. Meek's medical record that this man is going to be referred or has been referred to UCSD Plastic Services for additional care. He wanted to make sure that there was going to be something done once Mr. Meek's was transferred. Regarding the appointment of counsel issue, the appellants have not even mentioned the proper standard, which is abuse of discretion. I believe that they just completely glazed over they don't even mention that. And they don't apply the proper test, the likelihood of success on the merits and the ability of Mr. Meek's to articulate his claim. There's just a conclusory statement by the appellants that he couldn't articulate his claims, and that's it. There's no facts to indicate that that may or may not be the case or may not have been the case. And somehow they attempt to equate the expert issue, the complexity of the expert issue, and they somehow turn that into our admission that this is a complex case as a whole. It's not a complex case. The particular issue of whether or not the circumstances during the transfer to SATF, that fact, and Mr. Meek's opinion that his condition was emergent at that time, that's a complex issue. That's an issue that requires expert opinion. Now, if Mr. Meek's was a rocket scientist, he couldn't opine to that. It has nothing to do with how intelligent you are. It has everything to do with the foundation to make that statement, and he didn't have it. Your Honors, I have nothing further unless you have any further questions. I don't believe that we do. Thank you very much. Thank you. You used up your time, but we'll give you a minute for rebuttal if you want it. Okay. Thank you, Your Honors. I think I can clear up one item in the record. With respect to Dr. Parsons' authority, if you look at ER 182, Mr. Meek's verified complaint, he did allege that Dr. Parsons had authority. That's the only thing in the record about Dr. Parsons' authority. Dr. Parkinson's, I think it's telling that in his declaration, he did not deny that he had authority. That's just the lawyer assertion in the briefing. If Dr. Parsons did not have that authority, it would be in his declaration. And on this record, all the evidence suggests that he does have the authority to put the medical hold on. With respect to this claim that, oh, there was some difference in, you know, the approach to treatment, there wasn't any dispute about what the proper treatment was in this case. If you look at the undisputed facts, defendant's undisputed facts on ER 149 and 150, they repeat the record that repeatedly indicates that Dr. Parsons acknowledged that Mr. Meek's needed to be referred to the UCSD for treatment. Dr. Parsons didn't do oral surgery. There's no dispute that's what Mr. Meek's needed. And it's repeated in here from the time he had his wiring off and they realized, well, his teeth are all loose and he still has this fracture. Repeated recognitions in here all the way to the date he was to be transferred, recognizing that there's a problem and it needs further follow-up of this problem at ENT Plastics Referral. So there's really no, it's not a case where there was any dispute about what the proper treatment was. And then as far as this assertion that, well, what could Klarich and Allison do about the problem, well, ultimately they did get Mr. Meek's surgery. The problem is it was eight months after he arrived at their facility. It's just like the situation in Hunt where, yes, the defendants did get him his dentures. The problem is it was after three months of being deliberately indifferent to his medical problems. So, again, Dr. Klarich was the chief medical officer at the second facility. He had the authority to get Mr. Meek's the surgery he needed, which he ultimately did. The problem is they ignored his condition and he suffered in pain and lost weight for eight months while he was in their care. Thank you. Thank you, counsel. The case just argued is submitted. And we appreciate very much the arguments of both counsel, but we particularly want to thank Mr. Smith for taking this on as a pro bono case. Our pro bono project is very helpful to the court in helping to resolve difficult cases. So thank you again. Thank you.
judges: Tashima, Graber, Timlin